UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MILTON SYKES,

          Plaintiff,

     v.

ATHANNASIOUS, et al.,

          Defendants.

No.  2:12-cv-2570 TLN KJN P

FINDINGS AND RECOMMENDATIONS

Plaintiff is a state prisoner, currently incarcerated at the California Health Care Facility in Stockton, California.  Plaintiff proceeds, in forma pauperis, in this civil rights action filed pursuant to 42 U.S.C. § 1983 and California state law.  Plaintiff is represented by court-appointed counsel.  The action proceeds on plaintiff's First Amended Complaint, in which he raises claims arising from defendants' alleged failures in providing him with medical treatment.  Presently before the court are two motions to dismiss, one brought by defendant Dr. Khaira, and the other by defendants Dr. Aguilera and Dr. Haile.  For the reasons set forth below, the undersigned recommends that Dr. Khaira's motion be granted in part, that Dr. Aguilera's and Dr. Haile's motion be granted in its entirety, and that plaintiff be granted leave to file a Second Amended Complaint.

////

////

1

1   I. Background

2       A. Procedural History

3       This case proceeds on plaintiff's First Amended Complaint.  ("FAC," ECF No. 79-1.)  At

4   the time of the events alleged in the FAC, each of defendants Dr. Athannasious, Dr. Weiland,

5   Dr. Bick, Dr. Aguilera, and Dr. Haile was employed as a physician at California Medical Facility

6   ("CMF"), in Vacaville, California, and Dr. Khaira was employed as a physician at the Queen of

7   Valley Hospital in Napa, California and retained by CMF as plaintiff's urologist.  The FAC

8   includes claims under the Eighth Amendment for deliberate indifference to plaintiff's serious

9   medical needs (against all defendants), under California state law for negligence (against all

10  defendants), and under the First Amendment for retaliation against plaintiff for exercise of his

11  legal rights (against unspecified "CHCF prison staff").

12      Plaintiff filed the FAC on October 1, 2014.

13      On October 31, 2014, the undersigned issued findings and recommendations

14  recommending dismissal of defendants CMF and California Department of Corrections and

15  Rehabilitation ("CDCR") on grounds of Eleventh Amendment immunity.  (ECF No. 87.)  On

16  December 12, 2014, these findings and recommendations were adopted by the assigned district

17  judge.  (ECF No. 95.)

18      On November 21, 2014, defendants Dr. Athannasious, Dr. Bick, and Dr. Weiland filed a

19  joint answer.  (ECF No. 88.)

20      Now pending before the court are the following:

21          • Defendant Dr. Khaira's motion to dismiss plaintiff's Section 1983 and retaliation

22              claims against him, and to strike plaintiff's prayer for punitive damages under his

23              state law negligence claim.  ("Khaira MTD," ECF No. 92.)  Plaintiff filed an

24              opposition ("Khaira Oppo.," ECF No. 99), and defendant filed a reply ("Khaira

25              Reply," ECF Nos. 101, 102).

26          • Defendants Dr. Aguilera's and Dr. Haile's motion to dismiss plaintiff's claims

27              against them based on the applicable statute of limitations.  (ECF No. 103.)

28              Plaintiff filed an opposition (ECF No. 107), and defendants filed a reply (ECF

1   No. 109).

2   By order filed May 22, 2015, the undersigned directed plaintiff to file supplemental

3   briefing, and simultaneously granted leave to defendants Dr. Khaira, Dr. Aguilera, and Dr. Haile

4   to file responses to plaintiff's briefing.  (ECF No. 111.)  On June 19, 2015, plaintiff filed a

5   supplemental brief.  (ECF No. 112.)  On July 13, 2015, defendant Dr. Khaira filed a response.

6   (ECF No. 113.)

7   B.  Factual Allegations

8   In the operative FAC, plaintiff alleges as follows.

9   At all pertinent times, plaintiff was an inmate at CMF.  (Id. at 3.)  Plaintiff had previously

10   been treated for tuberculosis in 1996, and for bladder cancer in 2003.  (Id. at 6.)  Plaintiff alleges

11   that both conditions were treated successfully, and that he showed no signs of recurrence of either

12   condition until 2009.  (Id.)

13   According to plaintiff, in 2009, defendants Dr. Aguilera and Dr. Haile improperly

14   administered Interferon and Ribavirin to plaintiff.  Plaintiff alleges that these defendants coerced

15   plaintiff into signing waiver and/or consent forms; that they did not inform him of possible side

16   effects and risks based on his age and medical history; that they did not inform him that the

17   treatment was experimental; and that they failed to follow the proper protocols for administering

18   the drugs.  (Id. at 7.)  Plaintiff states that, shortly after he began receiving Interferon and

19   Ribavirin, he experienced the following symptoms:  passage of blood in his urine and semen,

20   blockage of his urinary tract, the development or reoccurrence of cancerous nodules in his

21   bladder, and a resurgence and spread of his tuberculosis.  (Id. at 5, 7-8.)  In one instance, plaintiff

22   allegedly experienced difficulty in breathing and passed out; he was then taken to Queen of the

23   Valley Hospital for emergency treatment.  At Queen of the Valley, he was allegedly informed that

24   his kidneys could not process all of the medications that he had been administered, and that his

25   doctors at CMF should have been aware of this fact.  (Id. at 7.)

26   In 2010, defendant Dr. Athannasious performed surgery on plaintiff to remove cancerous

27   nodules from his bladder.  (Id. at 5, 8.)  Afterwards, Dr. Athannasious placed plaintiff on a Bacille

28   Calmette-Guerin ("BCG") treatment.  (Id.)  According to plaintiff, he subsequently began to

3

1  suffer from incontinence, blood clots in his urine and semen, back-up of urine into his kidneys,

2  nocturnal enuresis, an intermittently weak and strong urine stream, and pain in his groin.  (Id. at

3  5, 8-9.)  Plaintiff alleges that he now has to wear a condom while he sleeps in order to catch blood

4  and urine that spills out at night; during the day, he wears a leg bag for the same reason.  (Id. at

5  9.)  Plaintiff contends that these symptoms resulted from the surgery being improperly performed,

6  as well as the BCG treatment; plaintiff also asserts that Dr. Athannasious failed to warn him of

7  the risks associated with the BCG treatment.  (Id. at 5,9.)

8          In August 2010, plaintiff was seen by defendant Dr. Khaira, a urologist at Queen of the

9  Valley Hospital, who recommended an emergency cystoscopy and possible "biopsy versus

10  transurethral bladder resection."  (Id. at 8.)  As of September 2010, plaintiff had not received

11  these treatments.  (Id.)  On January 26, 2012, Dr. Khaira performed surgery on plaintiff, during

12  which time he implanted a stent.  (Id. at 9.)  Plaintiff claims that the stent placement was

13  necessitated by the surgery and the BCG treatment administered by Dr. Athannasious.  (Id. at 5.)

14  Plaintiff describes the ensuing events as follows:

15              Dr. Khaira . . . directed that Plaintiff follow up with him in 2-4
                weeks to "discuss pathology results, and also to assess if his left-
16              sided pain has alleviated with the placement of the ureteral stent."
                On February 21, 2012[,] Dr. Khaira examined Plaintiff and noted
17              that "Plaintiff reports his flank pain has completely resolved," but
                he still has some left lower quadrant pain, but it is certainly severe
18              in nature"; "His main complaint is terminal dysuria, which is likely
                related to the indwelling ureteral stent"; ["]He denies any hematuria
19              or fevers" (see Dr. Khaira's 2/21/12 medical report).  Dr. Khaira's
                notes indicate that he agreed with Plaintiff that Plaintiff should
20              return in 3 months to plan on taking out the stent; and that Plaintiff
                was to follow up with him if problems arose before the scheduled
21              3-month follow-up visit.  A few days after being examined by
                Dr. Khaira, in addition to continuing to experience the problem of
22              passing urine in his sleep and blood with his semen, Plaintiff began
                to experience new, shocking pain in his groin.  Plaintiff complained
23              to the CMF doctors of this new pain[,] which kept growing in
                intensity.  Plaintiff was examined by Dr. Sanders of the CMF, and
24              she concluded that the stent in Plaintiff had become infected and
                that immediate intervention by Dr. Khaira was required.
25              Dr. Sanders communicated her findings to Dr. Khaira.  Dr. Khaira
                refused to operate to remove the stent until it had been in place for
26              at least 90 days.  The infected stent in Plaintiff went untreated for
                an unreasonably long period, ultimately resulted in plaintiff going
27              "man down" 4 times within one month due to unbearable pain.
                When Plaintiff went "man down" the fourth time, he was in so
28              much pain that he was crying even as the guards/nurses took him to

4

the prison hospital ward.  [. . .]  Plaintiff's penis was full of pus, and a culture test was performed.  Plaintiff . . . was eventually rushed to San Joaquin General Hospital[1] where he received treatment and underwent emergency surgery during which the stent was removed.  This was followed by about 8 days of hospitalization . . . ; it was determined that the stent had been infected for several days.[2]

(Id. at 9-10.)

Plaintiff was also treated by defendants Dr. Weiland and Dr. Bick, who were physicians at CMF during the time between the stent's implantation and its removal.  Plaintiff alleges the following acts and omissions by Drs. Weiland and Bick during this period:

- On December 28, 2011, plaintiff had a consultation with a urologist employed by the University of California, San Francisco.  This urologist requested a urine test for cancer cells and ordered a cystoscopy, both on an urgent basis.  As of January 25, 2012, Dr. Bick had ordered these services on a routine basis, rather than an urgent basis.  (Id. at 11.)

- When plaintiff went "man down" for the first time due to pain from the infected stent, Dr. Weiland became angry at plaintiff.  Rather than diagnose the source of the pain, Dr. Weiland interrogated plaintiff about a lawsuit that he (plaintiff) had filed.  Dr. Weiland thereafter refused to treat plaintiff.  (Id. at 10.)

- "Dr. Weiland and Dr. Bick allowed the infected stent in Plaintiff's bladder to go untreated for an unreasonably long period by placing his request for referral services on a routine basis instead of on an urgent/emergency basis."  (Id. at 11.)

Finally, plaintiff alleges that defendant Dr. Bick was the Chief Medical Officer at CMF, was the supervisor of defendants Dr. Aguilera, Dr. Haile, and Dr. Weiland, and was responsible for their acts and omissions.  (Id. at 10-11.)

---

[1] Plaintiff elsewhere alleges that his admission to San Joaquin General Hospital took place "around April 2012."  (ECF No. 79-1 at 11.)

[2] Plaintiff later alleges that "[t]he staff urologist at San Joaquin General Hospital . . . determined that the stent had been infected for a long time."  (ECF No. 79-1 at 12.)  The apparent contradiction between an infection lasting "several days" and one lasting a "long time" is not resolved elsewhere in the FAC.

1    Plaintiff seeks damages, injunctive relief, and attorneys' fees.  (Id. at 19-20.)

2    III.  Standard

3    Rule 12(b)(6) of the Federal Rules of Civil Procedure[3] provides for motions to dismiss for

4    "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In

5    considering a motion to dismiss pursuant Rule 12(b)(6), the court must accept as true the

6    allegations of the complaint in question, Erickson v. Pardus, 551 U.S. 89 (2007), and construe the

7    pleading in the light most favorable to the plaintiff.  Jenkins v. McKeithen, 395 U.S. 411, 421

8    (1969); Meek v. County of Riverside, 183 F.3d 962, 965 (9th Cir. 1999).  Still, to survive

9    dismissal for failure to state a claim, a pro se complaint must contain more than "naked

10   assertions," "labels and conclusions" or "a formulaic recitation of the elements of a cause of

11   action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-57 (2007).  In other words,

12   "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

13   statements do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Furthermore, a claim

14   upon which the court can grant relief must have facial plausibility.  Twombly, 550 U.S. at 570.

15   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

16   draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556

17   U.S. at 678.  Attachments to a complaint are considered to be part of the complaint for purposes

18   of a motion to dismiss for failure to state a claim.  Hal Roach Studios v. Richard Reiner & Co.,

19   896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

20   A motion to dismiss for failure to state a claim should not be granted unless it appears

21   beyond doubt that the plaintiff can prove no set of facts in support of his claims which would

22   entitle him to relief.  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).  In general, pro se

23   pleadings are held to a less stringent standard than those drafted by lawyers.  Haines v. Kerner,

24   404 U.S. 519, 520 (1972).  The court has an obligation to construe such pleadings liberally.  Bretz

25   v. Kelman, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc).  However, the court's liberal

26   interpretation of a pro se complaint may not supply essential elements of the claim that were not

27   pled.  Ivey v. Bd. of Regents of Univ. of Alaska, 673 F.2d 266, 268 (9th Cir. 1982).

28   ---
[3] Hereinafter, the term "Rule" refers to the applicable Federal Rule of Civil Procedure.

1    IV.  Analysis

2         A.  Defendant Dr. Khaira's motion to dismiss

3         Defendant Dr. Khaira moves to dismiss plaintiff's Section 1983 claim under Rule 12(b)(6)

4    on the grounds that plaintiff failed to sufficiently allege that Dr. Khaira, in treating plaintiff,

5    (i) acted under color of state law, and (ii) acted with deliberate indifference to plaintiff's serious

6    medical needs.  Dr. Khaira also moves to dismiss plaintiff's retaliation claim to the extent that it

7    is brought against Dr. Khaira, and to strike plaintiff's prayer for punitive damages pursuant to

8    plaintiff's state law medical malpractice claim.  The court addresses each of these motions in turn.

9              1.  Did Dr. Khaira act under color of state law when he treated plaintiff?

10        Dr. Khaira argues that plaintiff has not alleged sufficient facts to demonstrate that he

11   (Dr. Khaira) was acting under color of state law when he treated plaintiff, and as a consequence,

12   he may not be named as a defendant under plaintiff's Section 1983 claim.  (Khaira MTD, ECF

13   No. 92 at 8-9.)

14        Plaintiff counters that "when the state becomes entangled in a private party's actions so

15   that the state and the private party have a symbiotic relationship, the private party may be deemed

16   a state actor for Constitutional purposes."  (Khaira Oppo., ECF No. 99 at 3) (citing Burton v.

17   Wilmington Parking Auth., 365 U.S. 715 (1961)). In his opposition, plaintiff contends that

18   CDCR/CMF and Dr. Khaira were in fact so "entangled," on the basis of the following assertions:

19        1.  "Dr. Khaira was a partner with Napa Valley Urology Associates . . . [which] was

20            under contract with [CDCR] to provide urological services to inmates."  (Khaira

21            Oppo., ECF No. 99 at 3-4.)

22        2.  "Dr. Khaira and/or Napa Valley Urology Associates was selected and hired by CMF

23            to provide urological treatment and care to Plaintiff."  (Id. at 4.)

24        3.  "The urological services provided by Dr. Khaira were formerly provided by a CMF

25            staff urologist – [defendant] Dr. Athannasious.  CMF retained Dr. Khaira to provide

26            urological services for inmates after Dr. Athannasious retired."  (Id.)

27        4.  "Plaintiff did not have the right to select an urologist of his own choosing."  (Id.)

28        5.  "CMF compensated Dr. Khaira using wholly public funds."  (Id.)

6. "CMF was inextricably involved in every interaction between Plaintiff and Dr. Khaira, and together with Dr. Khaira, it controlled when and where Plaintiff received treatment from Dr. Khaira." (Id.)

7. "All or some of Dr. Khaira's reports were made or provided to CMF." (Id.)

8. "CMF benefits from its relationship with Dr. Khaira because the medical treatment and care he provided allowed CMF [to] discharge its duty to provide medical care to Plaintiff and other inmates." (Id.)

9. "Dr. Khaira's conduct in refusing to remove the infected stent is fairly attributable to [CMF] and [CDCR]."[4] (Id.)

In reply, Dr. Khaira points out that very little of the factual content set forth above is pled in the body of the FAC or the attached exhibits, and therefore, that the court may not consider it in ruling on his motion to dismiss. (ECF No. 102.)

Dr. Khaira is correct. "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. However, material which is properly submitted as part of the complaint may be considered." Hal Roach Studios, 896 F.2d at 1555 n.19 (internal citations omitted). The court cannot consider allegations advanced only in plaintiff's opposition in ruling on Dr. Khaira's motion.

Absent these additional allegations, there is insufficient factual content pled in the FAC to support a Section 1983 claim against Dr. Khaira. In general, private actors' conduct may qualify as state action for purposes of Section 1983 under four circumstances: "(1) the private actor performs a public function; (2) the private actor engages in joint activity with a state actor; (3) the private actor is subject to governmental compulsion or coercion; or (4) there is a governmental nexus with the private actor." George v. Sonoma Cnty. Sheriff's Dept., 732 F. Supp. 2d 922, 933 (N.D. Cal. 2010) (citing Gorenc v. Salt River Project Agric Imp. and Power Dist., 869 F.2d 503, 507–08 (9th Cir. 1989); Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003)). The only factual allegations in the FAC regarding a connection between Dr. Khaira and a state or

---

[4] The court notes in passing that this is a conclusory statement of the sort that is disfavored in considering whether a plaintiff has properly alleged a claim. See Iqbal, 556 U.S. at 678.

governmental actor are as follows:

- "Defendant Dr. Khaira is an employee of the Queen of the Valley Hospital assigned by the CMF as Plaintiff's urologist . . . ." (FAC, ECF No. 79-1 at 4.)
- "In January 2012 Dr. Khaira of the Queen of the Valley Hospital, who was selected by the CMF as Plaintiff's urologist, implanted a stent in Plaintiff which subsequently became infected . . . ." (Id. at 5.)

Standing alone, these two allegations are insufficient to meet any of the four tests under which a private actor's conduct might qualify as state action under Section 1983.

By order filed May 22, 2015, the undersigned directed plaintiff to file a supplemental brief, supported by a declaration setting forth pertinent facts, addressing the issue of whether Dr. Khaira might properly be named as a defendant herein. (ECF No. 111.) Plaintiff's declaration filed in response to this order provides in pertinent part:

> My first contact with Dr. Khaira was sometime in 2009. I met with him again sometime in 2010. CDCR sent me to be seen by Dr. Khaira as my urologist after Dr. Athannasious retired from CDCR. [. . .] CDCR selected and appointed Dr. Khaira to provide the urological services formerly provided by Dr. Athannasious. I had no right to select a urologist of my own choosing. I had no role in the selection of Dr. Khaira. To the best of my knowledge[,] Dr. Khaira was under contract with CDCR to provide urological services in place of Dr. Athannasious. CDCR was responsible for negotiating and paying Dr. Khaira for his services to me and other inmates of CDCR. CDCR was highly involved in every interaction I had with Dr. Khaira. The procedure involved CDCR approving or denying my request for medical services. CDCR made the decision regarding whether I was to be seen by Dr. Khaira, when and where. [sic] Dr. Khaira's reports were sent directly to CDCR for review and follow-up. CDCR benefited from Dr. Khaira because his services enabled CDCR [to] fulfil its duty to provide medical care to CDCR inmates such as myself. [CMF] is a unit of CDCR.

(ECF No. 112-1 at 1-2.)

On July 13, 2015, Dr. Khaira filed a response which provides in pertinent part:

> Dr. Khaira has reviewed the additional allegations and case law submitted in plaintiff's supplemental brief and believes that such allegations are sufficient to render Dr. Khaira a "state actor" for the purposes of plaintiff's cause of action under Section 1983 to survive a motion to dismiss. Therefore, Dr. Khaira will not contest plaintiff's showing in his supplemental brief.

(ECF No. 113 at 1.)

　　　　As acknowledged by Dr. Khaira, the additional facts advanced by plaintiff are sufficient to establish that Dr. Khaira acted under color of state law in treating plaintiff.  CDCR contracted with Dr. Khaira in place of Dr. Athannasious (a former CDCR employee); CDCR approved plaintiff's treatment; CDCR determined when and where plaintiff would be treated by Dr. Khaira; CDCR, rather than plaintiff, paid Dr. Khaira; and CDCR received and reviewed Dr. Khaira's reports regarding plaintiff's care.  In West v. Atkins, 487 U.S. 42 (1988), the Supreme Court held that a private physician who contracted with a state government to provide medical services to prisoners at state-prison hospitals acted under color of state law, and therefore, could be properly named as a defendant in a Section 1983 suit.  In West, as in the instant case, a state agency (CDCR) "bore an affirmative obligation to provide adequate medical care to [plaintiff]; the State delegated that function to [the private physician]; and [the private physician] voluntarily assumed that obligation by contract."  Id. at 55-56.  Whether the relationship between CDCR and Dr. Khaira, as described in plaintiff's declaration, is characterized as satisfying the "public function," "joint action," or "governmental nexus" test, George, 732 F. Supp. 2d at 933, it is evident that Dr. Khaira's actions in treating plaintiff are "fairly attributable to the State," West, 487 U.S. at 54.

　　　　In light of the foregoing, the undersigned recommends that the motion to dismiss plaintiff's Section 1983 claim against Dr. Khaira be granted, but that plaintiff be granted leave to file a Second Amended Complaint so that he can plead the allegations necessary to establish that Dr. Khaira acted under color of state law in treating plaintiff.  Plaintiff is cautioned that the court cannot refer to either of his previously-filed complaints in order to make his Second Amended Complaint complete.  Local Rule 220 requires that an amended complaint be complete in itself without reference to any prior pleading.  This requirement is because, as a general rule, an amended complaint supersedes the original complaint.  See Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967).  Therefore, in an amended complaint, as in an original complaint, each claim and the involvement of each defendant must be sufficiently alleged.  Once plaintiff files an amended complaint, the original pleading no longer serves any function in the case.  Nevertheless, facts

1    alleged in an amended complaint "must not be inconsistent with those already alleged."  Lacey v.

2    Maricopa Cnty., 693 F.3d 896, 939 (9th Cir. 2012) (en banc).

3                    2.  Has plaintiff adequately pled an Eighth Amendment violation by Dr. Khaira?

4    Dr. Khaira next moves to dismiss plaintiff's Section 1983 claim against him, on the

5    grounds that his (Dr. Khaira's) alleged conduct did not rise to the level of deliberate indifference

6    to plaintiff's serious medical needs, the standard required to articulate an Eighth Amendment

7    violation.  (Khaira MTD, ECF No. 92-1 at 9-11.)

8     "[D]eliberate indifference to serious medical needs of prisoners constitutes the

9    unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment."  Estelle v.

10   Gamble, 429 U.S. 97, 104 (1976) (internal citations, punctuation and quotation marks omitted).

11   Plaintiff must show "deliberate indifference" to his "serious medical needs," id. at 104, which

12   includes "both an objective standard – that the deprivation was serious enough to constitute cruel

13   and unusual punishment – and a subjective standard – deliberate indifference."  Snow v.

14   McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by Peralta v.

15   Dillard, 744 F.3d 1076 (9th Cir. 2014) (en banc).

16   To meet the objective element, plaintiff must demonstrate the existence of a serious

17   medical need.  Estelle, 429 U.S. at 104.  Such a need exists if the failure to treat the injury or

18   condition "could result in further significant injury" or cause "the unnecessary and wanton

19   infliction of pain."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotes and

20   citations omitted).   Serious medical needs include "[t]he existence of an injury that a reasonable

21   doctor or patient would find important and worthy of comment or treatment; the presence of a

22   medical condition that significantly affects an individual's daily activities; [and] the existence of

23   chronic and substantial pain."  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992),

24   overruled in part on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

25   Under the subjective element, a prison official is deliberately indifferent only if the

26   official "knows of and disregards an excessive risk to inmate health and safety."  Toguchi v.

27   Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotes and citation omitted).  To prevail on

28   a claim for deliberate indifference, a prisoner must demonstrate that the prison official "kn[ew] of

1   and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of

2   the facts from which the inference could be drawn that a substantial risk of serious harm exists,

3   and he must also draw the inference." Farmer, 511 U.S. at 837.  Deliberate indifference "may

4   appear when prison officials deny, delay or intentionally interfere with medical treatment, or it

5   may be shown by the way in which prison physicians provide medical care." Hutchinson v.

6   United States, 838 F.2d 390, 394 (9th Cir. 1988).  The court "need not defer to the judgment of

7   prison doctors or administrators" when deciding the deliberate indifference element. Hunt v.

8   Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989).

9        In applying this standard, the Ninth Circuit has held that before it can be said that a

10   prisoner's civil rights have been abridged, "the indifference to his medical needs must be

11   substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this

12   cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing

13   Estelle, 429 U.S. at 105-06.)  A complaint that a physician has been negligent in diagnosing or

14   treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

15   Amendment.  Even gross negligence is insufficient to establish deliberate indifference to serious

16   medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  A difference of

17   opinion between medical professionals concerning the appropriate course of treatment generally

18   does not amount to deliberate indifference to serious medical needs. Toguchi, 391 F.3d at 1058;

19   Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  Also, "a difference of opinion between a

20   prisoner-patient and prison medical authorities regarding treatment does not give rise to a [§]1983

21   claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  To establish that such a

22   difference of opinion amounted to deliberate indifference, the prisoner "must show that the course

23   of treatment the doctors chose was medically unacceptable under the circumstances" and "that

24   they chose this course in conscious disregard of an excessive risk to [the prisoner's] health."

25   Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); see also Wilhelm v. Rotman, 680 F.3d

26   1113, 1123 (9th Cir. 2012) (doctor's awareness of need for treatment followed by his unnecessary

27   delay in implementing the prescribed treatment sufficient to plead deliberate indifference); see

28   also Snow, 681 F.3d at 988 (decision of non-treating, non-specialist physicians to repeatedly deny

1   recommended surgical treatment may be medically unacceptable under all the circumstances).

2          Plaintiff contends that the following allegations in the FAC suffice to state a claim against

3   Dr. Khaira for deliberate indifference to plaintiff's serious medical needs under the Eighth

4   Amendment:

5              A few days after being examined by Dr. Khaira [on February 21,
              2012], in addition to continuing to experience the problem of
6              passing urine in his sleep and blood with his semen, Plaintiff began
              to experience new, shocking pain in his groin.  Plaintiff complained
7              to the CMF doctors of this new pain[,] which kept growing in
              intensity.  Plaintiff was examined by Dr. Sanders of the CMF, and
8              she concluded that the stent in Plaintiff had become infected and
              that  immediate  intervention  by  Dr. Khaira  was  required.
9              Dr. Sanders communicated her findings to Dr. Khaira.  Dr. Khaira
              refused to operate to remove the stent until it had been in place for
10             at least 90 days.  The infected stent in Plaintiff went untreated for
              an unreasonably long period, ultimately resulted in plaintiff going
11             "man down" 4 times within one month due to unbearable pain.
              When Plaintiff went "man down" the fourth time, he was in so
12             much pain that he was crying even as the guards/nurses took him to
              the prison hospital ward.  [. . .]  Plaintiff's penis was full of pus, and
13             a culture test was performed.  Plaintiff . . . was eventually rushed to
              San Joaquin General Hospital where he received treatment and
14             underwent emergency surgery during which the stent was removed.
              This was followed by about 8 days of hospitalization . . . it was
15             determined that the stent had been infected for several days.

16

17  (FAC, ECF No. 79-1 at 9-10.)

18         As discussed further below, standing alone these allegations properly allege an Eighth

19  Amendment claim.  However, Dr. Khaira argues that these allegations are contradicted by notes

20  in a two-page Forensic Clinic Report, dated February 21, 2012 ("February 21 Report") attached

21  as an exhibit to the FAC (see ECF No. 79-1 at 79-80).[5]  Dr. Khaira points specifically to notes

22  _____

23  [5]  Dr. Khaira seeks judicial notice of the contents of the February 21 Report pursuant to Federal
    Rule of Evidence 201.  (ECF No. 92-2 at 1.)  This request will be denied.  Rule 201 permits the
24  court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is
    generally known within the trial court's territorial jurisdiction; or (2) can be accurately and
25  readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.
    Evid. 201.  Statements contained within a medical report authored by a defendant are not
26  "generally known" within the Eastern District of California, nor is such a report a "source[]"
    whose accuracy cannot reasonably be questioned.  Id.  Dr. Khaira is correct in observing that
27  "the Court may properly consider matters of public record [including] pleadings, orders, and
    papers on file in another court." (ECF No. 92-2 at 2.)  Courts may "take judicial notice of court
28  filings and other matters of public record[, as they] are readily verifiable and, therefore, the

which read:

> I discussed the options at length with the patient.  He actually feels that with the stent in place, he is feeling much better.  Even though he has had terminal dysuria, his pain issues have greatly abated, and he is inclined to leaving the stent in place at least temporarily . . . he understands that the stent cannot be left in indefinitely.  Certainly after 6 months, there is a high association of encrustation and difficulty removing stents, as well as developing infections.  He is agreeable to a return visit in 3 months' time, which (sic) we will plan on taking out the stent, and we will reassess how he is feeling in terms of the flank pain thereafter.  He understands the possibility the stent may have to be replaced.

 (ECF No. 79-1 at 79-80.)  According to Dr. Khaira, "[t]he only material allegation regarding

Dr. Khaira acting with deliberate indifference is a vague and unsupported claim that he refused to

operate to remove Plaintiff's stent until it had been in place for 90 days (an allegation

contradicted by the medical record dated February 21, 2012, attached to Plaintiff's verified

[FAC]).  This vague and internally inconsistent allegation simply does not rise to the level of

---

proper subject of judicial notice."  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006) (internal citation omitted).  Nevertheless, the court's power in this regard is limited to taking judicial notice of reasonably indisputable facts, such as the date on which a document was filed.  While the court can, and will, take judicial notice of the fact that the February 21 Report provides, "He is agreeable to a return visit in 3 months' time, which we will plan on taking out the stent . . ." (sic) (ECF No. 79-1 at 80), it cannot go the extra step and credit the assertion made in that phrase as being true.  "A court can only take judicial notice of the existence of those matters of public record . . . but not of the veracity of the arguments and disputed facts contained therein."  U.S. v. S. Cal. Edison Co., 300 F.Supp.2d 964, 974 (E.D. Cal. 2004) (Wanger, J.)  Per a leading treatise:

> [C]ourts that do not specify the "fact" being noticed when they take notice of "court records" can end up turning a hearsay statement into "truth" by the alchemy of judicial notice.  Astute courts reiterate that while court records may be sources of reasonably indisputable accuracy when they memorialize some judicial action, this does not mean that courts can notice the truth of every hearsay statement filed with the clerk.  To do so would make judicial notice a kind of bastard res judicata in which parties end up being bound by facts they never had any opportunity to contest.  Courts can avoid this by carefully specifying just what is being noticed; e.g., that the court merely notices that something was said at a hearing for the purpose of inferring its [e]ffect on the persons who heard it, not for its truth.

21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Federal Rules of Evidence § 5104 (2d. ed. 2015) ("Facts Judicially Noticeable; Indisputability").

14

1   deliberate indifference necessary to prove a section 1983 claim . . . ."  (Reply, ECF No. 101 at 5.)

2         While the court may not take judicial notice as to what is contained in medical records as

3   being factually correct, in ruling on a Rule 12(b)(6) motion, the court must credit the statements

4   in the February 21 Report as if they were alleged in the complaint.  "A statement in a pleading

5   may be adopted by reference elsewhere in the same pleading . . . .  A copy of a written instrument

6   that is an exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c).

7   "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party

8   questions . . . may be considered in ruling on a Rule 12(b)(6) motion to dismiss."  Branch v.

9   Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), overruled on other grounds by Galbraith v. Cnty. of

10  Santa Clara, 307 F.3d 1119 (9th Cir. 2002).  "[A] plaintiff can . . . plead himself out of a claim by

11  including unnecessary details [in exhibits] contrary to his claims."  Sprewell v. Golden State

12  Warriors, 266 F.3d 979, 988 (9th Cir. 2001).  Not only is the February 21 Report attached as an

13  exhibit to the FAC, but plaintiff directly references it in paragraph 29 of the FAC, which

14  provides:  "On February 21, 2012 Dr. Khaira examined Plaintiff and noted that 'Plaintiff reports

15  his flank pain has completely resolved,' but he still has some left lower quadrant pain, but it is

16  certainly less severe in nature'; 'His pain complaint is terminal dysuria, which is likely related to

17  the indwelling ureteral stent'; He denies any hematuria or fevers' (see Dr. Khaira's 2/21/12

18  medical report)."  (sic) (ECF No. 79-1 at 9-10.)  Accordingly, the court must consider whether

19  plaintiff has "ple[]d himself out of a claim," Sprewell, 266 F.3d at 988, by citing the February 21

20  Report.

21        Dr. Khaira's argument is unavailing, for as plaintiff argues, there is no apparent

22  contradiction between the notes in the February 21 Report and plaintiff's allegations of

23  Dr. Khaira's deliberate indifference.  Plaintiff alleges that "[a] few days after being examined by

24  Dr. Khaira [on February 21, 2012] . . .  in addition to continuing to experience the problem of

25  passing urine in his sleep and blood with his semen,[6] Plaintiff began to experience new, shocking

26  _____

27  [6] The February 21 Report does not refer to plaintiff passing blood in his semen.  Instead, the
    Report uses the term "hematuria," which refers to blood in the urine.  Dorland's Illustrated
    Medical Dictionary 589 (W.B. Saunders Co. 1985).  The term for blood in the semen is

28  "hemospermia."  Id. at 597.

1    pain in his groin.  [. . .]  Plaintiff was examined by Dr. Sanders of the CMF, and she concluded

2    that the stent in Plaintiff had become infected and that immediate intervention was required.

3    Dr. Sanders communicated her findings to Dr. Khaira.  Dr. Khaira refused to operate to remove

4    the stent until it had been in place for at least 90 days."  (ECF No. 79-1 at 10.)  These allegations

5    do not contradict the February 21 Report in any respect.  Moreover, they are sufficient to state a

6    claim against Dr. Khaira under the Eighth Amendment.  The alleged diagnosis of an infection and

7    the attendant pain experienced by plaintiff constitute a serious medical need.  Dr. Khaira's alleged

8    refusal to operate after being notified of the infection may amount to deliberate indifference, on

9    the grounds that it "was medically unacceptable under the circumstances" and "chose[n] . . . in

10   conscious disregard of an excessive risk to [the prisoner's] health."  Jackson, 90 F.3d at 332.  As

11   plaintiff has satisfactorily alleged both the subjective and objective prongs of an Eighth

12   Amendment claim, Dr. Khaira's motion to dismiss the claim on these grounds should be denied.

13   However, as discussed above, the undersigned recommends that this claim be dismissed and the

14   plaintiff be granted to leave to amend in order to allege that, in treating plaintiff, Dr. Khaira acted

15   under color of state law.

16              3.  Is Dr. Khaira properly named as a defendant under plaintiff's retaliation claim?

17              Dr. Khaira moves to dismiss plaintiff's third claim, for retaliatory denial of services and

18   accommodation, to the extent that it is pled against him.  In the FAC, plaintiff alleges that, since

19   the filing of initial complaint, unnamed CHCF prison staff have (i) denied his request to see a

20   kidney specialist, (ii) moved him to inferior living quarters, and (iii) interfered with his legal

21   mail, all in retaliation for filing the instant lawsuit.  (ECF No. 79-1 at 18-19.)  It appears that

22   Dr. Khaira is concerned that he could be held liable for the retaliatory acts alleged because

23   plaintiff elsewhere pleads that Dr. Khaira (and other individually-named defendants) were "at all

24   relevant times . . . agents, employees, and or servants of [CMF] and/or [CDCR] acting within the

25   scope of their agency and/or employment."  (Id. at 11.)

26              Plaintiff has not responded to this argument.

27              Plaintiff has failed to allege in specific terms how Dr. Khaira was involved in the alleged

28   retaliatory conduct.  There can be no liability under 42 U.S.C. § 1983 unless there is some

1    affirmative link or connection between a defendant's actions and the claimed deprivation.  Rizzo

2    v. Goode, 423 U.S. 362 (1976); May v. Enomoto, 633 F.2d 164, 167 (9th Cir. 1980); Johnson v.

3    Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

4           Accordingly, the undersigned recommends, to the extent that the retaliation claim is pled

5    against defendant Dr. Khaira, that this claim be dismissed.

6                         4.  May plaintiff seek punitive damages against Dr. Khaira for medical

7                             malpractice?

8           Defendant Dr. Khaira moves to strike the prayer for punitive damages under plaintiff's

9    state law medical malpractice claim, contending that plaintiff has failed to comply with the

10   requirements of California Code of Civil Procedure § 425.13.  That statute is summarized as

11   follows:

12              [I]n an action for damages "arising out of the professional
                negligence of a health care provider", the plaintiff must
13              demonstrate to the Court that there is a substantial probability that
                the plaintiff will prevail on the claim before the Court permits the
14              plaintiff to plead exemplary damages. In addition, a plaintiff's
                motion to allow the filing of an amended pleading must be filed
15              within two years after the complaint or initial pleading is filed or
                not less than nine months before the date the matter is first set for
16              trial, whichever is earlier.

17   Burrows v. Redbud Cmty. Hosp. Dist., 188 F.R.D. 356, 361 (N.D. Cal. 1997).

18          The court begins by noting that, according to the Ninth Circuit, Federal Rule of Civil

19   Procedure 12(f) "does not authorize a district court to strike a claim for damages on the ground

20   that such damages are precluded as a matter of law."  Whittlestone, Inc. v. Handi-Craft Co., 618

21   F.3d 970, 971 (9th Cir. 2010).  A number of courts in this judicial district have, in the wake of

22   Whittlestone, construed procedurally-improper motions to strike under Rule 12(f) as motions to

23   dismiss brought under Rule 12(b)(6).  See,e.g., Duenez v. City of Manteca, No. 2:11-cv-1820-

24   LKK-KJN, 2011 WL 5118912 at *7 (E.D. Cal. Oct. 27, 2011) ("[I]nsofar as Defendants[']

25   motion is a motion to strike Plaintiffs' claims for damages . . . that motion is DENIED.  The court

26   now turns to its analysis construing Defendants['] motion as a motion to dismiss."); Pena v.

27   Taylor Farms Pacific, No. 2:13–CV–01282–KJM–AC, 2014 WL 1665231 at *12 (E.D. Cal. Apr.

28   23, 2014) ("The motion to strike is more properly construed as a motion to dismiss."); Nuwintore

                                                    17

1    v. United States, No. 1:13–cv–00967–AWI–JLT, 2014 WL 1333998 at *1 (E.D. Cal. Apr. 3,

2    2014) (adopting findings and recommendations in which "the Magistrate Judge converted the

3    motion to strike to a motion to dismiss under Rule 12(b)(6).").  The undersigned follows suit and

4    construes Dr. Khaira's motion to strike plaintiff's claim for punitive damages for medical

5    malpractice as a motion to dismiss under Rule 12(b)(6).

6            District courts in California are divided on the issue of whether California Code of Civil

7    Procedure § 425.13 applies in federal cases in which plaintiffs plead state law medical

8    malpractice claims.  Compare Burrows, 188 F.R.D. at 361 (holding that "the procedural

9    requirements of section 425.13 were not so 'intimately bound up' with the state's substantive law

10   that it must be applied by a federal court.") with Allen v. Woodford, No. 1:05–cv–01104–OWW–

11   LJO, 2006 WL 1748587 at *20 (E.D. Cal. Jun. 26, 2006) ("In all respect[s], § 425.13 is so

12   'intimately bound up' with the substantive law of Allen's underlying claim that it must be applied

13   by federal courts when addressing the issue of punitive damages.").  The undersigned previously

14   found, consonant with Allen, that "plaintiff [had to] petition the court for punitive damages as

15   against moving defendants pursuant to Section 425.13 for such relief under her state law claims."

16   Rhodes v. Placer Cnty., No. 2:09–cv–00489-MCE-KJN, 2011 WL 1302240 at *21 (E.D. Cal.

17   Mar. 31, 2011), adopted by 2011 WL 1739963 (E.D. Cal. May 4, 2011).  However, in a more

18   recently-published decision, the assigned district judge explicitly distinguished Allen and Rhodes

19   in finding that "the plain meaning of [Federal Rule of Civil Procedure] 8(a)(3) conflicts with . . .

20   § 425.13, making § 425.13 inapplicable in federal court."  Estate of Prasad v. Cnty. of Sutter, 958

21   F. Supp. 2d 1101, 1121 (E.D. Cal. 2013).

22           The court need not decide whether the reasoning of Prasad compels a different result than

23   that reached in Allen and Rhodes.  Plaintiff, in his opposition, concedes that his "request for

24   exemplary (punitive) damages is in relation to Plaintiff's claim(s) for violation of his Eighth

25   Amendment rights; rather than his claim(s) for medical malpractice . . . ."  (ECF No. 99 at 6.)  In

26   other words, plaintiff seeks punitive damages only under his Section 1983 claim.  "[P]unitive

27   damages are available in 'a proper' § 1983 action."  Carlson v. Green, 446 U.S. 14, 22 (1980)

28   (citing Carey v. Piphus, 435 U.S. 247, 257 n. 11 (1978)).

1    In light of plaintiff's clarification, the court recommends that Dr. Khaira's motion to

2    dismiss plaintiff's prayer for punitive damages under his medical malpractice claim be granted.

3    Plaintiff is encouraged, in any amended complaint that he may file, to clarify that his prayer for

4    punitive damages against Dr. Khaira is brought only pursuant to his Section 1983 claim.

5    The court now turns to defendants Dr. Aguilera's and Dr. Haile's motion to dismiss.

6    B.   Defendants Dr. Aguilera and Dr. Haile's motion to dismiss

7    Defendants Dr. Aguilera and Dr. Haile jointly move to dismiss all claims against them as

8    barred by the applicable statute of limitations.

9    These defendants' argument runs as follows.  Plaintiff filed his original complaint on

10   October 15, 2012.  (ECF No. 1.)  He therein made no reference to Dr. Aguilera or Dr. Haile, or to

11   his treatment with Interferon and Ribavirin.  Yet the FAC, which was filed on October 1, 2014,

12   contained allegations regarding Dr. Aguilera and Dr. Haile's administration of Interferon and

13   Ribavirin to plaintiff in 2009.  (ECF No. 79-1.)  These defendants now argue that plaintiff's

14   claims against them were subject to a two-year statute of limitations, and therefore are time-

15   barred, even when plaintiff filed his original complaint.  Accordingly, defendants contend that,

16   even assuming the newly-pled claims asserted in the FAC were found to relate back to the

17   original complaint, they would still be time-barred.  (Aguilera-Haile MTD, ECF No. 103 at 4.)

18   In opposition, plaintiff contends that his claims against Dr. Aguilera and Dr. Haile are not

19   time-barred.  (Oppo. Aguilera-Haile MTD, ECF No. 107 at 3.)  He explains:

20   In 2009[,] when plaintiff complained about the effects of Interferon

21   and Ribavirin treatment, he was erroneously informed that the
     symptoms were simply normal side effects and that his treatment
     was proper.  Thus Plaintiff had no knowledge and could not know

22   of any injuries attributable to the said Interferon and Ribavirin
     treatments.  It was subsequently after he continued experiencing the

23   adverse side effects – blood in urine and semen, and growth of
     cancerous nodules in his bladder that Plaintiff became aware of

24   being actually injured.

25   (Id. at 3.)  Plaintiff also notes that his initial complaint documented the injuries that allegedly

26   stemmed from administration of Interferon and Ribavirin.  He also cites the fact that he moved to

27   amend his complaint in July 2013 and in August 2013 to name Dr. Aguilera and Dr. Haile as

28   defendants.  (Id.)

1    Defendants Dr. Aguilera and Dr. Haile counter that plaintiff cannot avail himself of the

2    late discovery doctrine to toll the applicable statute of limitations.  (ECF No. 109 at 1.)  They also

3    renew their assertion that plaintiff cannot avail himself of the relation back doctrine to save his

4    claims.  (Id. at 1-2.)

5    Defendants are correct that Section 1983 does not incorporate a statute of limitations;

6    instead, courts are instructed to apply the applicable limitations period for personal injury actions

7    under the forum state's law.  Lukovsky v. City & Cnty. of San Francisco, 535 F.3d 1044, 1048

8    (9th Cir. 2008).  Defendants are also correct that California law specifies a two-year statute of

9    limitations for personal injury actions.  Cal. Code Civ. Proc. § 335.1.[7]  However, federal law is

10   clear that a "claim accrues 'when the plaintiff knows or has reason to know of the injury which is

11   the basis of the action.'"  Lukovsky, 535 F.3d at 1048 (quoting TwoRivers v. Lewis, 174 F.3d

12   987, 991 (9th Cir. 1999)).  The determination of when the plaintiff knew or had reason to know of

13   the injury "requires an inquiry into what a plaintiff would need to prove in order to succeed on his

14   theory of the case . . . ."  Rosales-Martinez v. Palmer, 753 F.3d 890, 896 (9th Cir. 2014); see also

15   Payne v. Arpaio, No. 09-cv-1195-PHX-NVW, 2009 WL 3756679 at *7 (D. Ariz. Nov. 4, 2009)

16   ("There is some debate [within the Ninth Circuit] about what constitutes the 'injury' resulting

17   from deliberate indifference to a serious medical need.  Two empirically distinct injuries are:

18   (1) lack of medical care that is cruel and unusual punishment and (2) the bodily injury that flows

19   from the lack of medical care.").  Nevertheless, "a mere continuing impact from past violations is

20   not actionable."  Knox v. Davis, 260 F.3d 1009, 1013 (9th Cir. 2001) (internal quotation omitted)

21   (emphasis in original).  Finally, while federal law governs the determination of when claims

22   accrue in Section 1983 cases, state law applies to determinations of equitable tolling.  Hardin v.

23   ─────────────────────

24   [7] The court assumes that plaintiff is not entitled to the benefit of California Code of Civil
     Procedure § 352.1(a), which tolls the statute of limitations for up to two years for certain civil

25   actions brought by prisoners who are serving less than life sentences.  See Fink v. Shedler, 192
     F.3d 911, 914 (9th Cir. 1999) (applying Cal. Code Civ. Proc. § 352.1).  In reaching this

26   conclusion, the court is guided by the fact that, in 2011, it appears that plaintiff filed a petition for
     writ of habeas corpus under 28 U.S.C. § 2254, in which he states that he was sentenced to three

27   consecutive life sentences.  See Sykes v. Dickinson, No. 2:11-cv-00742-SVW-AGR (C.D. Cal.
     Jan. 25, 2011) (ECF No. 1).

28

1  Straub, 490 U.S. 536 (1989)

2       The undersigned has carefully examined the FAC and the exhibits attached thereto in an

3  attempt to ascertain when plaintiff first knew, or had reason to know, of the adverse effects of

4  Interferon and Ribavirin, and is unable to reach a firm conclusion on the question.  Plaintiff has

5  attached as an exhibit to the FAC an inmate grievance on CDCR Form 602, dated June 28, 2009,

6  which provides in pertinent part:

7        The side effects from the Ribavirin 200 mg that was started on
       5/13/09 was too much for me.  On 6/03/09, approximately one
8        month later I asked doctor John Doe, some questions about the
       Ribavirin.  1) Could it kill me? Doctor John Doe, told me yes
9        people have died from Ribavirin.  I told [him] that I was now
       urinating blood.  At this time my red blood count had dropped
10       down to a low.  Dr. John Doe ordered shots for me two (2) times a
       week to raise my red blood count.  I asked Dr. John Doe some more
11       questions.   1) Was my liver in any eminent [sic] danger?  The
       doctor[']s answer was there is a protocol that should be followed
12       for a person who was already suffering from kidney problems . . . .
       I have to wonder why didn't a red flag go up concerning the state of
13       my kidney and all of the medications I was already taking.

14  (ECF No. 79-1 at 25).  In this inmate grievance, plaintiff sought a referral to an outside kidney

15  specialist as a remedy.  (Id.at 24.)  On initial examination, it would seem that plaintiff's claims

16  against Dr. Aguilera and Dr. Haile accrued on June 3, 2009, the date on which the conversation

17  with "Dr. John Doe" occurred.  Plaintiff describes at least one symptom in his grievance –

18  passage of blood in his urine – that he later alleged in his FAC as stemming from the

19  administration of Interferon and Ribavirin.  Moreover, the fact that "Doctor John Doe" informed

20  plaintiff that Ribavirin could have killed him would appear to have put plaintiff on notice of a

21  potential Eighth Amendment violation.

22       On the other hand, in the FAC, plaintiff describes the following symptoms stemming from

23  the administration of Interferon and Ribavirin:  passage of blood in his urine and semen, blockage

24  of his urinary tract, the development or reoccurrence of cancerous nodules in his bladder, and a

25  resurgence and spread of his tuberculosis.  Only one of these symptoms is described in the

26  excerpt quoted above – passage of blood in the urine – and no explicit connection is drawn

27  between this symptom and the administration of Ribavirin, either by plaintiff or by "Dr. John

28  Doe."

Plaintiff contends that the statute of limitations should be deemed to begin to run on a later, unspecified date because when he "complained about the effects of Interferon and Ribavirin treatment, he was erroneously informed that the symptoms were simply normal side effects and that his treatment was proper." (ECF No. 107 at 3.)  However, the court may not rely on this representation in deciding the limitations issue, for the allegation is nowhere to be found in the FAC.  The court is not free to infer, e.g., that plaintiff was reassured, after his interview with "Dr. John Doe" in June 2009, that the symptoms he was experiencing were not attributable to Interferon and Ribavirin.  As noted above in the discussion of Dr. Khaira's motion to dismiss, "a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  Hal Roach Studios, 896 F.2d at 1555 n. 19.  Moreover, plaintiff has not alleged the date on which he knew, or had reason to know, that the symptoms alleged stemmed from administration of Interferon and Ribavirin.

By order filed May 22, 2015, the court directed plaintiff to file a supplemental brief, supported by a declaration setting forth pertinent facts, addressing the issue of when he learned that treatment with Interferon and Ribavirin might be harming him.  (ECF No. 111.)  In response, plaintiff stated that he became aware of this fact around July or August of 2009.  (ECF No. 112 at 5.)  Plaintiff added:

> In light of the fact that this date is more than 2 years before the 10/15/12 date on which Plaintiff's initial Complaint was filed, Plaintiff concedes that his 42 U.S.C. § 1983 claim[] against Dr. Aguilera and Dr. Haile is barred by the applicable statute of limitations.

(Id.)

As plaintiff now acknowledges that his claims against Dr. Aguilera and Dr. Haile are time-barred, the undersigned recommends dismissal of these claims with prejudice.

V.  Conclusion

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1.  Dr. Khaira's motion to dismiss (ECF No. 92) be granted, and;

A.  To the extent that it is pled against Dr. Khaira, plaintiff's Section 1983 claim be dismissed without prejudice;

      B.  To the extent that it is pled against Dr. Khaira, plaintiff's retaliation claim be dismissed without prejudice; and

      C.  Plaintiff's prayer for punitive damages pursuant to his state law medical malpractice claim be dismissed with prejudice.

    2.  Dr. Aguilera and Dr. Haile's motion to dismiss (ECF No. 103) be granted.

    3.  Dr. Aguilera and Dr. Haile be dismissed with prejudice as defendants in this action.

    4.  Plaintiff be granted thirty days to file a second amended complaint that complies with this order, the requirements of the Civil Rights Act, the Federal Rules of Civil Procedure, and the Local Rules of Practice. The second amended complaint must also bear the docket number assigned to this case and must be labeled "Second Amended Complaint."

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 5, 2015

                            _Kendall J. Newman_

                         KENDALL J. NEWMAN
                         UNITED STATES MAGISTRATE JUDGE

/syke2570.mtd